386 A.2d 7

James WILLIAMS, a minor, by his parent and natural guardian, Jo Ann Williams, and in her own right, Appellants,

v.

EASTERN ELEVATOR CO. and Bituminous Casualty Co. and Roberts Delicatessen.

Superior Court of Pennsylvania.

Argued Sept. 13, 1977.

Decided April 13, 1978.

Robert S. Lucarini, Philadelphia, for appellants.

Joseph W. Fullem, Jr., Philadelphia, for appellee, Eastern Elevator Co.

Harry A. Short, Jr., Philadelphia, for appellee, Bituminous Cas. Co.

No appearance entered nor brief submitted for appellee, Roberts Delicatessen.

Before WATKINS, President Judge, and JACOBS, CER-CONE, PRICE, VAN der VOORT and SPAETH, JJ.

VAN der VOORT, Judge:

This action arises out of injuries suffered by James Williams (hereinafter, Williams) as the result of an elevator accident. The accident occurred on December 1, 1971, on the premises of Jeanne Roberts, trading as Roberts Delicatessen, (hereinafter, Roberts) at 205 South 18th Street, Philadelphia. Williams, a 17 year old minor, was employed by Roberts as a kitchen helper.

Suit was instituted on behalf of Williams by his parent and natural guardian, Jo Ann Williams (hereinafter, appellant), and in her own right, against Eastern Elevator Company (hereinafter, Eastern) and Bituminous Casualty Company (hereinafter, Bituminous), appellees herein. Roberts was joined as an additional defendant.

Eastern was employed by Roberts to service and maintain the elevator and to inspect it on a bi-monthly basis. Bituminous performed semiannual inspections on the elevator for Roberts for the purpose of determining compliance with the state elevator code, this in lieu of inspections by a state inspector. It had no responsibility for servicing or maintaining the elevator.

The case was tried before the Honorable Edward J. Blake and a jury from October 22 to October 29, 1975. On the latter date a non-suit was entered in favor of all defendants (appellees herein). A motion to take off the non-suit was denied by the court en banc by order dated September 29, 1976. It is from that order that this appeal was taken.

The elevator on which the accident occurred was a freight elevator, sometimes described in the testimony as a hoist, which traveled between the basement and third floors of the building occupied by Roberts Delicatessen. The elevator was a wooden structure at least 40 years old, consist-

ing of a floor, three walls and a top. The fourth side of the elevator, the front, was completely open. There was no car gate, although there was a gate affixed to each floor of the building which opened or closed vertically by lifting or lowering it. The elevator was operated by means of two cables which ran down the right-hand side of the car as one faced forward from the inside. An operator pulled one cable to start the elevator upward and the other to start it downward. The car ran on wood guide rails on each side of the car.

The elevator entrance on the first floor was in the form of a brick archway which was slightly more than 5 feet wide and approximately 8 feet in height (94½ inches) at the center of the arch. There was a protecting landing gate across the width of the archway (which was raised and lowered vertically). When closed, the gate rose 5 feet, 6 inches from the floor, leaving completely open to the elevator and unenclosed the archway space above the gate and below the top of the arch, a width of approximately 5 feet at the top of the gate and a height of 28½ inches at the center of the arch. There was a clearance of 5½ inches between the front of the elevator floor and the shaftway wall which extended from the top of the archway to the upper floors of the building.

Williams testified that at the time of the accident he entered the elevator on the first floor for the purpose of returning some supplies to the second floor. He closed the landing gate and pulled the cable to his right to start the car. When the floor of the car reached about the midway point of the landing gate, the car began to shake and vibrate. This shaking and vibration knocked Williams off balance and he fell to a sitting position on the elevator floor facing the back of the elevator. Part of his body, namely his lower back, buttocks and upper thighs, extended over the front edge of the floor at the open end of the elevator. By this time the elevator floor had moved above the gate. As it neared the top of the archway, that portion of his back, buttocks and thighs which were extending over the open

front of the elevator were caught and held by the bricks forming the top of the archway while the elevator floor continued to rise up against the back of his legs, raising and folding them against his body above the waist which was being held from further upward movement by the wall it had encountered. He described the experience as like going through a washing machine wringer, legs extended and head down, his fingers nearly touching his toes. With the brick wall at the top of the archway forming a barrier to the further upward movement of that part of his body which was out of the elevator and the rising elevator floor folding his legs at the waist against the upper part of his body, his body was forced from the elevator and dropped to the first floor in front of the gate.

His fellow employees in the adjacent kitchen rushed to his aid and he was taken to Jefferson Hospital. His back was broken shortly above the waist at the 12th vertebra and the 11th vertebra was dislocated, ultimately requiring an operation to fuse the 10th, 11th and 12th vertebrae. According to the medical testimony, there is a residual deformity as a result of the compression fracture of the 12th vertebra and he will remain partially, but permanently disabled.

Williams had worked at Roberts some 6 months prior to the date of the accident. By his account he had used the elevator 3 or 4 times a day, 6 days a week over that 6 month period. He testified that it had been vibrating and shaking since his first day on the job but never to the extent that it did at the time of the accident. Two of his co-workers testified that they, too, had experienced a frequent vibrating and shaking of the elevator similar to the type Williams experienced at the time of the accident, although not as violent. Roberts, on the other hand, testified that she had never experienced any such vibrations while using the elevator.

The evidence pertaining to the responsibility for inspecting, servicing and maintaining the elevator consisted of the testimony of two Eastern mechanics and a Bituminous inspector. Each described in some detail the scope of his

inspection. All three testified that they had never experienced a shaking or vibrating of the elevator and that no one had ever reported such a condition to them, although they had inquired on each visit as to how the elevator was operating.

At the conclusion of the testimony of appellant's witnesses, the appellees moved for a compulsory non-suit on the grounds (1) that the testimony as to the happening of the accident presented the jury with a physical impossibility, and (2) that there was no evidence of negligence. The non-suit was granted and later sustained by the court en banc for the reasons above stated. This appeal followed.

In passing on an appeal from a judgment of compulsory non-suit, the appellant must be given the benefit of all evidence favorable to her, together with all reasonable inferences of fact arising from the evidence. All conflicts in the evidence must be resolved in favor of the appellant: *Frangis v. Duquesne Light Company*, 232 Pa.Super. 420, 423, 335 A.2d 796 (1975). The correctness of the lower court's ruling must be examined in accordance with these well established principles.

In concluding that Williams' testimony described an accident that was physically impossible, the court stated—

"Mr. Williams testified that:

'When I fell to the floor of the elevator the elevator floor itself was above the top of the gate . . . As it got to the archway and it only takes a matter of seconds to get to the archway, my rear end, the back of my rear end was caught against the archway and the elevator floor itself came up the back of my legs and was pressing me against the brick wall . . . After the elevator passed by me, I do not recall being unconscious, I might have been . . . It's like a washing machine wringer. That's the way I was brought through and after it passed, after I came out my body just unfolded and fell . . . When I passed through I was doubled over like touching your toes with your fingers.'

The court en banc interpreted this testimony as describing a physical impossibility, stating in its opinion—

> "Earlier testimony indicated that the clearance space between the front of the floor of the elevator and the elevator shaftway wall was approximately five and a half inches. Thus, the plaintiff, who testified that he was five foot nine and weighed a hundred and sixty pounds, presented to the jury a question of fact as to how the accident occurred based upon Mr. Williams testimony and compared with an apparent incontrovertible physical fact that Mr. Williams' entire body could not have passed through an opening five and a half inches wide without his body being crushed beyond recognition."

This interpretation of Williams' testimony interpolates something that he did not say; namely, that his body was somehow forced into the 5½ inch space between the elevator and the inside wall of the shaftway and then dropped to the first floor as the elevator continued its ascent above his body. What Williams said, as quoted by the court immediately preceding its interpretation, was that ". . . the back of my rear end was caught against *the archway* and the elevator floor itself came up the back of my legs and was pressing me against the brick wall." This is a clear statement that he was being pressed against the brick of the archway and not of the shaftway above it. Even if Williams' description was ambiguous, which it is not, the appellant is entitled to have the evidence reviewed in the light most favorable to Williams. Williams' testimony that he was pushed against the brick of the archway rather than the shaftway is confirmed by the fact that when he fell he landed in front of the gate on the first floor. Had he been wedged within the shaftway, as the court read his testimony, his body would have been dropped to the bottom of the shaftway in the basement. We must conclude that Williams' testimony has been misunderstood by the court en banc and that he did not describe the accident in a manner that could be described as physically impossible.

In Williams' description of the accident, he did not attempt to estimate the width of the space into which his body was compressed. On cross examination he was confronted with the fact that in a pre-trial deposition he had estimated the space at 2 inches, a physical impossibility without mangling his body. Williams insisted throughout his cross examination that he did not know the precise measurement of the space but that it had "seemed like" 2 inches to him at the time of its occurrence. He held to the position that he did not know the measurements or the precise point at which his back became pinioned against the bricks of the archway. We must remember that as this accident occurred Williams was facing to the rear of the elevator and the obstacle that combined with the rising floor of the elevator to compress his body was behind him. He was describing something which he could feel but could not see because it was behind him. Nevertheless, the court appears to have held him to his pre-trial estimate of 2 inches and concluded that this meant that Williams' body had been folded and wedged in the 5½ inch space between the vent wall and the elevator. This was an impermissible conclusion to draw on a non-suit, for all reasonable inferences are to be construed in favor of Williams and all conflicts in the evidence resolved in his favor. If there was significance to the measurement of the space or the point of contact with the brick of the archway, it was for the jury to determine, not the court on a non-suit.

We must recognize the actuality that this accident took place and that Williams' back was broken by compression. No contention has been made that the accident happened in any other way than compression or that Williams was guilty of any negligence or contributed in any way to the accident. He was found in front of the first floor gate by fellow employees moments after he fell. In the face of this undisputed evidence, it would be ironic to say that the appellant could not get to the jury because of some mistake in the description of the details of the accident.

The court en banc also concluded that there was no evidence of negligence on the part of the appellees. Had

there been a gate across the open front of the elevator, Williams' fall would have been contained within the elevator. The absence of a gate would appear to raise an issue of negligence. A jury could certainly consider the shaking and jolting that caused Williams to lose his balance as circumstantial evidence of further negligence. In weighing such circumstantial evidence, our former doctrines of res ipsa loquitur and exclusive control have been replaced by Section 328 D of the *Restatement of Torts, (Second Edition )*, which states:

"(1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when

"(a) the event is of a kind which ordinarily does not occur in the absence of negligence;

"(b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

"(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

"(2) It is the function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn.

"(3) It is the function of the jury to determine whether the inference is to be drawn in any case where different conclusions may reasonably be reached."

The ruling to this effect was made in *Gilbert v. Korvette's*, 457 Pa. 602, 327 A.2d 94 (1974). In *Gilbert*, this test of negligence was held applicable both to the owner of an escalator on which an injury had occurred and to the company which had contracted to service and maintain the escalator. Applied to the case before us, this establishes Section 328 D as an appropriate test in determining the existence of negligence on the part of the elevator owner (Roberts) and the service and maintenance contractor (Eastern).

■ However, Bituminous had no contractual responsibility to service or maintain the elevator. Its sole duty was to perform semiannual inspections for possible infractions of

the Pennsylvania elevator code, acting as an approved alternative to a state inspector. Bituminous performed that duty and no code violations were found; and indeed none is alleged. Consequently, there is no basis for attributing to Bituminous any responsibility for the failure of the elevator to function satisfactorily.

The appellant has also assigned as error two rulings on evidence, but there is no necessity for us to pass upon them in view of our conclusion that the non-suit must be lifted for other reasons as to two of the appellees. The rulings, sustained or reversed, would have no bearing on the liability of Bituminous, the third appellee.

The order of the court below in refusing to lift the non-suit is affirmed as to Bituminous but reversed as to Roberts and Eastern and the case is remanded for a new trial.

WATKINS, former President Judge, and HOFFMAN, J., did not participate in the consideration of this case.